# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* M. PARKINSON, Minor

UNPUBLISHED
May 14, 2015

No. 322444
Genesee Circuit Court
Family Division
LC No. 11-128077-NA

AFTER REMAND

Before: BOONSTRA, P.J., and SAWYER and O'CONNELL, JJ.

PER CURIAM.

We remanded this termination of parental rights case to the trial court "to clarify and articulate the statutory ground(s) on which it based its ruling, and in its discretion take additional evidence or articulate further findings of fact regarding the elements of each or any such ground" and also to "articulate a best-interest analysis that is amenable to appellate review, including consideration of the child's placement with relatives." See *In re Parkinson Minor*, unpublished order of the Court of Appeals, issued March 17, 2015 (Docket No. 322444). Following our remand, the trial court held a hearing on April 22, 2015 and clarified the statutory grounds for termination upon which its ruling was based, and further articulated its best-interest analysis. We affirm.

## I. PERTINENT FACTS AND PROCEDURAL HISTORY

In August 2011, petitioner filed a petition for temporary custody of the child. The petition alleged that respondent-mother,[1] who was then 19 years old, had custody of the child, had substance abuse and mental health issues, and made poor parenting decisions. The petition alleged that a November 2010 investigation for neglect was substantiated and that respondent-mother was provided with services in lieu of court involvement. She failed to comply with services, did not maintain contact with petitioner, and did not maintain stable housing. Respondent-father, who had a criminal history that included a controlled substance offense, was

---

[1] Respondent-mother has not pursued an appeal of the trial court's termination of her parental rights.

serving a prison sentence "with a maximum discharge date of November 2030." Following a preliminary hearing, the trial court authorized the petition.

The court obtained jurisdiction over the child following an adjudication trial in October 2011. The minor child was removed from respondents' care and placed with a maternal aunt in December 2011. The initial service plan had the goal of reunification.

Almost immediately after starting services, respondent-father missed a December 2011 drug screen; a January 2012 drug screen was positive for opiates and morphine. Respondent-father was referred to counseling for random testing, but had not completed any additional drug screens by March 2012. Respondent-father began parenting classes in January 2012. Respondent-father owned a house that he had inherited from his father. Respondent reported that he was self-employed but did not provide any proof of income. Respondent-father was late for a family visit on December 15, 2011 and missed visits on December 22 and 29, 2011, on January 5 and 26, and on February 9, 2012. However, when he did attend visits, he displayed appropriate parenting skills and affection for the minor child.

According to a May 2012 court report, respondent-father had been jailed sometime during the reporting period, but was released on March 8, 2012. Both respondents were attending parenting classes, but had not provided random drug screens or obtained substance abuse assessments. Parenting time had been canceled in March 2012, after two missed visits. The parents had not been in contact with the agency and attempts to contact them by phone and by mail were unsuccessful. The court reinstated parenting time in May, but directed the parents to "notify the agency of their intent to attend parenting time no less than 15 minutes prior to each scheduled visit."

Respondents reinitiated contact with the agency in June 2012. The agency called to remind them of family visits and, while they attended seven of eight visits, they arrived late. Respondent-father failed to provide a drug screen as directed on May 17, claiming he "suffers from shy bladder and was unable to produce urine."

By October 2012, respondent was again incarcerated for a parole violation. Respondent was still incarcerated as of January 2013. In January, the trial court authorized petitioner to file a supplemental petition for termination. Respondent was still incarcerated as of June 2013.

Petitioner filed the supplemental petition in July 2013. It alleged that respondent-father had failed to benefit from services. It outlined his lack of attendance at family visits and alleged that he failed to complete any drug screens between December 8, 2011 and September 26, 2012 (apart from the one positive screen in January), had failed to complete parenting classes, and had been incarcerated on a parole violation since September 2012. Termination was requested under MCL 19b(3)(c)(*i*), (c)(*ii*), (g), and (j).

The hearing was repeatedly adjourned. According to the September 2013 court report, respondent-father was still incarcerated. The report asserts that "DHS mailed letters to engage father in services and hearings. He refused mailed [sic] from the court."

The termination hearing began in October 2013. Respondent participated by telephone. Natasha Smith, the foster-care worker since July 2013, testified that the minor child came to the agency's attention in October or November 2010, because of neglect by respondent-mother.

Regarding respondent-father, Smith testified that he had a criminal history. In October 2001, he pleaded guilty to "a misdemeanor firearms." In 2004, he pleaded guilty to "felony charges of firing a firearm from a vehicle," fleeing and eluding, and possession of controlled substances. At some unspecified time, respondent was paroled from prison. His barriers to reunification included "[s]ubstance abuse, employment, parenting, counseling, therapy." His participation in reunification services "was minimum, if non-existent."

Smith testified that respondent-father was referred for random drug screens. Between December 2011 and September 2012, he missed "numerous screens"; he tested positive for opiates and morphine in January 2012. Smith referred to the supplemental petition, which identified the positive drug screen on January 12, 2012, and 38 missed screens (approximately one per week) between December 8, 2011 and September 26, 2012.

Smith testified that respondent-father attended parenting classes, but did not complete them; he attended 12 of 16 class sessions, and last attended a session in June 2012. On January 5, 2012, respondent-father was referred to "Infant Toddler Treatment Court". Respondent-father was unable to participate because he missed two intake appointments. Smith did not know why respondent missed the appointments.

Smith testified that respondent-father missed many family visits and last saw the minor child on September 20, 2012. Between December 13, 2011 and September 26, 2012, respondent-father attended 11 weekly visits without incident; he attended one visit on July 11 at which he had to be "instructed to stay in the restricted area." Respondent-father attended eight other visits for which he arrived anywhere between 19 and 52 minutes late. Respondent-father canceled or failed to appear for 23 visits; he missed 17 straight visits between February 9 and May 31, 2013.

Smith testified that respondent-father returned to prison around September 2012 for a parole violation. Both Smith and her predecessor contacted respondent-father "to inquire about what he might be doing in the prison, making sure that he was aware of what he needed to do[.]" Smith identified letters she sent to respondent-father. The letters were not returned by the Post Office and respondent never answered the letters.

Smith testified that respondent-father was due to be released "sometime between now and December" 2013. Given his history, Smith did not believe that respondent-father was likely to participate in services upon his release. Smith recommended termination of respondent-father's parental rights due to his "lack of benefit from many of the services that were recommended, lack of participation[.]" She added that the child had been in his current foster home since December 2, 2011 and that placing the child with his father "would be detrimental . . . to him because of the . . . stability of his current placement (indistinct)." Smith stated that the child was "doing extremely well" in his foster home; he had adjusted well to his placement and was attending pre-kindergarten, where he "tested above grade average."

Respondent-father admitted to a criminal history. In February 2002, he was charged with a controlled substance offense and pleaded guilty to delivery of less than 50 grams of cocaine. He was not sent to prison. In April 2004, he accumulated additional charges of discharging a firearm from a motor vehicle, third-degree fleeing and eluding, and felon in possession of a firearm. He was sentenced to 4 to 30 years in prison for the cocaine conviction and to 14 months to 5 years for the felon-in-possession conviction. Respondent-father was paroled from prison on October 30, 2007. He violated his parole, returned to prison, and was paroled again on April 14, 2009. Respondent-father again violated his parole, returned to prison in 2010, and was paroled again on October 11, 2011.

Respondent-father testified that once he was paroled, he immediately met with the foster-care worker's supervisor to express his interest in reunification. He stated that he went to parenting classes, but did not complete them because he absconded from his parole during that time and was incarcerated for 30 days. Respondent-father claimed to have attended "at least half" of the family visits, although he was sometimes late due to problems with transportation, and to have called in nearly every time he was unable to attend.

Respondent-father testified that he used to have a substance abuse problem. He admitted that he missed most of the required drug screens because he "had a problem" with opiates and knew he would test positive, but stated that he since overcome his substance abuse problem and was confident that a drug screen would be negative. Respondent-father testified that he "enrolled with just about every class" available to him in prison. Respondent-father further stated that he would participate in services upon his release and would obtain suitable employment.

Respondent-father admitted that he received one letter from Smith. He did not respond because "I wasn't aware that I was supposed to." Respondent-father denied receiving Smith's second letter.

Respondent-father testified that he loved the child and was "really good with him." He stated that he provided his child with necessities such as food, shelter, and clothing. Respondent-father opined that termination of his parental rights was not in the child's best interests "because I've always taken care of my child. I love my son. He loves me. The last time I spoke with him was right before I got incarcerated . . . and all he kept saying was dad, I want to go home. I want to go home. Mom, I want to go home," which indicated that the child knew who his parents were and that he missed respondent "just like I missed him."

The trial court held in abeyance the remainder of the hearing for six months upon the request of petitioner, in order to give respondents more time to comply with services. The hearing resumed on May 29, 2014. Respondent-father participated by video conference. Stephanie Young, the foster-care worker since October 2013, testified that she wrote to respondent-father in prison to "let him know that I'm the new worker." Young testified that she maintained regular contact with respondent-father, sending him copies of his treatment plans and notice of court hearings.

Young testified that respondent-father provided a certificate showing that he had completed parenting classes. She believed that "he completed a substance abuse class early on."

Young contacted the prison and was told that services were made available to inmates "based on earliest release dates" and "availability of funds." Respondent-father's earliest release date was December 2014 and he apparently was not yet eligible for services.

The child had not had any contact with respondent-father since respondent-father returned to prison in 2012. Young met with the child once a month and he had never said anything about respondent-father to her. Young recommended termination of respondent's parental rights based on "his lack of parenting time" with the minor child.

Respondent-father testified that he had engaged in services in prison since the October 2013 hearing. Specifically, he took parenting classes and completed "Phase I" and "Phase II" of a substance abuse program. Respondent-father believed he had benefited from the services. In parenting classes, he "picked up a little bit of . . . how to raise your child and what not to do, you know, what to do."

Respondent-father testified that his maximum discharge date was in 2040, but he had an early release date of December 20, 2014. Respondent-father had already been before the parole board. One member of the board told respondent "that he was going to give me my parole" or that "he seen no problem re-paroling me again . . . ." Respondent-father expected to be released on or about December 20, 2014. Upon release, respondent intended to return to his house. He was willing to participate in additional services as required by the petitioner. Respondent-father testified that he loved his son and wanted to have a relationship with him.

As stated in this Court's previous opinion:

The trial court found that § 19b(3)(j) had not been established, but did not indicate which of the remaining grounds it relied upon to terminate respondent's parental rights. Further, although the trial court's factual findings were not clearly erroneous, *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); MCR 3.977(K), the court did not explain how those findings related to the elements of the remaining available grounds for termination. For example, the trial court did not identify conditions that led to the adjudication, MCL 712.19b(3)(c)(i), did not indicate what other conditions may have existed for purposes of MCL 712A.19b(3)(c)(ii), and did not expressly find that respondent failed to provide proper care or custody, MCL 712A.19b(3)(g). Although a trial court need not engage in "elaborate or ornate discussion" of its factual findings and conclusions of law, it should attempt to render the record "amenable to appellate review." *Foskett v Foskett*, 247 Mich App 1, 12; 634 NW2d 363 (2001); see also MCR 2.517(A)(2). [*In re Parkinson*, unpublished opinion per curiam of the Court of Appeals, issued March 17, 2015 (Docket No. 322444).]

At the hearing held on remand, the trial court stated that the statutory grounds for termination found in MCL 712A.19b(3)(c)(*i*) (conditions that led to the adjudication continue to exist), (c)(*ii*)(other conditions exist that have not been rectified), and (g)(parent unable to provide proper care or custody) had been proven by clear and convincing evidence. The trial court found that the conditions that led to the adjudication or other conditions that had arisen since the initial

petition, including respondent-father's incarceration for drugs and firearms, failure to comply with terms of his parole, and substance abuse issues, continued to exist, as evidenced by his repeated parole absconding and missed or positive drug screens. The trial court therefore found MCL 712A.19b(3)(c)(*i*) and (*ii*) had been proven by clear and convincing evidence. The trial court further found that respondent-father's criminality, repeated incarcerations, lack of contact with the child, and failure to adequately participate in parenting time when he was not incarcerated indicated that he would be unable to provide the child with proper care and custody, and therefore that MCL 712A.19b3(g) was proven by clear and convincing evidence.

Regarding the child's best interests, the trial court found that the child had no relationship with respondent-father and had not seen him since 2012. Respondent-father often failed to participate or was late to parenting time meetings. The trial court further found that the child had a strong bond and loving relationship with his maternal aunt and called her "mom." The trial court found that, considering the child's placement with relatives, that it was in his best interests to terminate respondent-father's parental rights.

## II. STATUTORY GROUNDS

We review for clear error a trial court's finding that at least one statutory ground for termination has been proven by clear and convincing evidence. *In re Trejo*, 462 Mich 341, 356-357; 612 NW2d 407 (2000); MCR 3.977(K). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). Only one statutory ground need be established to support the order for termination of parental rights. *In re Frey*, 297 Mich App 242, 244; 824 NW2d 569 (2012).

The trial court did not err in holding that MCL 712A.19b3(g) was proven by clear and convincing evidence. The record shows that respondent-father was unable to provide proper care or custody due to his incarceration and left the child in the custody of respondent-mother, who was an unsuitable caretaker due in part to her own substance abuse issues. Respondent-father repeatedly violated his parole and was re-incarcerated. Further, respondent has not done substantially addressed his substance abuse problem, missed numerous drug screens while in the community and, despite participating in a substance abuse program in prison, he had no documented ability to remain sober when released. We therefore hold that the trial court did not err in finding that this statutory ground was proven by clear and convincing evidence.

Further, it appears that the trial court initially took jurisdiction over the child in part due to respondent-father's unavailability due to incarceration. This condition continued to exist due to respondent's violations of his parole and re-incarceration. Additionally, respondent-father's substance abuse problem was not alleged in the initial petition but was alleged in the supplemental petition. The trial court's findings indicate that respondent had been provided with services to address that issue and it had not been rectified. Therefore, the trial court's findings underlying its conclusion that MCL 712A.19b(3)(c)(*i*) and (*ii*) were not clearly erroneous.

We therefore affirm the trial court's holding that statutory grounds for termination were proven by clear and convincing evidence.

## III. BEST-INTEREST DETERMINATION

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). Whether termination is in the child's best interests is to be determined by a preponderance of the evidence. *In re Moss*, 301 Mich App 76, 90; 836 NW2d 182 (2013). "In deciding whether termination is in the child's best interests, the court may consider the child's bond to the parent, the parent's parenting ability, the child's need for permanency, stability, and finality, and the advantages of a foster home over the parent's home." *In re Olive/Metts*, 297 Mich App 35, 43; 823 NW2d 144 (2012).

Here, the trial court found that the child did not possess a bond to respondent-father, that respondent-father would not be able to appropriately parent him, that the child was strongly bonded to his maternal aunt, and that the child's current placement possessed the advantages of permanency and stability over placement with respondent-father. These findings are not clearly erroneous and we therefore affirm the trial court's best-interest determination.

Affirmed.

/s/ Mark T. Boonstra
/s/ David H. Sawyer
/s/ Peter D. O'Connell